## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 13 2018, 8:07 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Scott E. Shockley
Defur Voran LLP
Muncie, Indiana

ATTORNEY FOR APPELLEE

Jack Quirk
Quirk and Hunter, P.C.
Muncie, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Myriah Greiner, <br> *Appellant-Petitioner,* <br><br> v. <br><br> Nicholas Greiner, <br> *Appellee-Respondent* | February 13, 2018 <br><br> Court of Appeals Case No. 18A02-1707-DR-1638 <br><br> Appeal from the Delaware Circuit Court <br><br> The Honorable John M. Feick, Judge <br><br> Trial Court Cause No. 18C04-0812-DR-148 |

**Vaidik, Chief Judge.**

## Case Summary

[1]     Myriah Greiner ("Mother") appeals the trial court's order modifying primary custody of her daughter. We affirm.

# Facts and Procedural History

[2] In 2009, Mother and Nicholas Greiner ("Father") divorced, and Mother was awarded primary custody of their two children: N.G., born in August 2000, and H.G., born in April 2002. H.G. suffers from an extra growth on one of her chromosomes and, as a result, is "very mentally delayed." Tr. Vol. II p. 63.

[3] In 2013, Mother notified Father that she planned to move with the children to Florida for work. Father initially objected, but he and Mother were able to reach an agreement that allowed her to make the move to Florida. One condition of the agreement was that Mother would set aside time "any open evening" for Father to talk with the children. Appellant's App. Vol. II p. 25. The court approved the agreement, and Mother and the children moved to Florida.

[4] In April 2017, Father petitioned for primary custody of fifteen-year-old H.G. He did not seek custody of sixteen-year-old N.G. because "[h]e's doing so well down in Florida. He has a lot going on." Tr. Vol. II p. 6. Father alleged, however, that H.G. was not doing well. She has an extreme phobia of storms and needs an adult or N.G. to help her remain calm and feel safe. In his petition, Father argued that H.G.'s best interests would be served by a custody modification because he has more time to devote to her care and development. Mother contested Father's allegations, and a hearing was held on his petition.

[5] During the hearing, multiple witnesses—Father, H.G.'s grandmother, and a family friend who is close with H.G.—testified that H.G. routinely called or

texted them saying that it was storming and that she was home alone and scared. H.G. would call or text whenever she was home alone during a storm, regardless of the day of the week or time of day. Some calls were "as late as two, three in the morning[.]" *Id.* at 37. Father explained that these conversations could last for hours, saying that he talked with H.G. "for six to eight hours at a time on the phone. All the time." *Id.* at 30. All three witnesses also stated that Mother would routinely block them from being able to contact H.G. Mother did not provide any warning that she was going to block H.G. from communicating with Father, grandmother, and the family friend, nor did Mother explain to the witnesses why they were blocked from speaking with H.G.

[6] Father was also questioned about his job. He was self-employed selling concessions at fairs and events. One such event took place during Father's most recent extended parenting time, and Father was gone for approximately two weeks. Father took N.G. with him to help sell concessions, and H.G. was left in Muncie in the care of Father's fiancée and Father's mother. Father stated that even if he has to leave H.G. for work that all of his family was in Muncie—his mom, two brothers, his sister, and his fiancée—and could care for H.G. while he was traveling.

[7] Mother disputed the claims that H.G. was routinely left home alone, stating that H.G. had never been left home alone or unsupervised. But N.G. testified that on at least one occasion H.G. was home alone for approximately three hours. Mother did, however, admit to restricting H.G.'s access to her phone

and blocking people from contacting H.G., including Father. Mother said that she restricted H.G.'s access to her phone as a method of discipline. She also explained that she blocked certain numbers, including Father's, because she found it "very inappropriate that everybody tends to want to communicate with [H.G.] and they never communicate with me." *Id.* at 74.

[8] After both parents rested, the trial court held an in-camera interview with H.G. The interview was transcribed and is part of the record on appeal, but the transcript of the interview was sealed from review by either parent.[1] The court also instructed the parents that they were not to question H.G. about what was discussed during her interview.

[9] In its order, the trial court found that H.G., on multiple occasions, "has not been allowed to communicate with or to receive phone calls from [Father] or his family." Appellant's App. Vol. II p. 34. It also found that Mother was a good mother, but "she has not been available several times during the week, nor is any adult available during the week to be with the child." *Id.* The court concluded that it is in H.G.'s best interests for primary custody to be granted to Father and that "there has been a substantial change in circumstances since the children have moved to Florida in that there is not family readily available to assist."

---

[1] Mother petitioned the trial court to allow the parties access to the sealed transcript but was denied. As part of her appeal, she moves that this Court either exclude the sealed portion of the transcript from the appellate record or that we grant the parents access to it. In an order handed down today, we deny both requests.

[10] Mother now appeals.

# Discussion and Decision

[11] Mother contends that the trial court erred when it granted Father primary custody of H.G. The trial court may not modify an existing custody order unless the modification is in the best interests of the child and there has been a substantial change in one or more statutory factors. Ind. Code § 31-17-2-21. The statutory factors to be considered are enumerated in Indiana Code section 31-17-2-8 and include the child's interactions and interrelationships with her parents, siblings, and any other person who may affect her best interests. Father, as the party petitioning for modification, "bears the burden of demonstrating that the existing custody [arrangement] should be altered." *In re Paternity of Snyder*, 26 N.E.3d 996, 998 (Ind. Ct. App. 2015). We review custody modifications for an abuse of discretion, granting latitude and deference to the trial court. *Id.* We will not reweigh the evidence or judge witness credibility; rather, we consider only the evidence most favorable to the judgment of the trial court and any reasonable inferences therefrom. *Id.*

[12] When a trial court enters findings of fact and conclusions, as it did here, we engage in a two-step analysis of the court's decision. *G.G.B.W. v. S.W.*, 80 N.E.3d 264, 268 (Ind. Ct. App. 2017). First, we must determine whether the evidence supports the findings of fact, and second, we must determine if the findings of fact support the conclusions thereon. *Id.* We will not set aside the

findings or conclusions unless clearly erroneous—when there is no support in the record for the findings or the findings do not support the judgment. *Id.*

[13] Mother argues that the trial court's conclusion that a substantial change in circumstances had occurred "was based upon a factor that was foreclosed by Father's October 8, 2013 stipulation agreeing to Mother's relocation to Florida[.]" Appellant's Br. p. 13. Stated another way, Mother argues that the fact that "there is not family readily available to assist" her in Florida was true in October 2013 and therefore it cannot be a change in circumstances. In considering an alleged change in circumstances, the trial court is "strictly limited to consideration of changes in circumstances which have occurred since the last custody decree." *Wolljung v. Sidell*, 891 N.E.2d 1109, 1111 (Ind. Ct. App. 2008) (citing *Spoor v. Spoor*, 641 N.E.2d 1282, 1285 (Ind. Ct. App. 1994)).

[14] Mother's argument is narrowly focused on the specific language used by the trial court—there is not family readily available to assist—and misses the bigger picture of what the trial court found. In its order, the trial court enumerated multiple findings of fact and conclusions, including that Mother "has not been available several times during the week, nor is any adult available during the week to be with the child." Appellant's App. Vol. II p. 34. Furthermore, the trial court found that "while in the state of Florida, several times [H.G.] has not been allowed to communicate with or to receive phone calls from [Father] and his family." *Id.* Both findings support the conclusion that there has been a substantial change in H.G.'s interactions and interrelationships with Mother and Father since Mother moved to Florida. *See* Ind. Code § 31-17-2-8(4)(A).

And, as previously noted, this is one of the statutory factors to be considered in a custody-modification proceeding.

[15] Mother also argues that, even if the trial court was correct in concluding that a change in circumstances had occurred, the change was not substantial and did not adversely affect H.G. such that modification was in her best interests. We disagree. A change in circumstances "must be judged in the context of the whole environment, and the effect on the child is what renders a change substantial or inconsequential." *Steele-Giri v. Steele*, 51 N.E.3d 119, 127 (Ind. 2016). H.G. was routinely calling Father, her grandmother, and a family friend at all hours of the night to tell them that she was scared and home alone. These conversations lasted for six to eight hours while the adult on the other end of the line tried to calm H.G. down and subdue her fear of the storm. Mother's unavailability to parent H.G. in these situations is a substantial change in circumstances and has adversely impacted H.G., making modification in her best interests. Father admitted that there are times when he is unavailable to parent H.G. because of his job selling concessions at fairs and events across the state. However, unlike Mother, Father does not leave H.G. home alone when he is unavailable. Rather, she is left in the care of Father's fiancée or a member of Father's extended family, like H.G.'s grandmother. Furthermore, Mother routinely blocked H.G. from being able to communicate with Father, her grandmother, or the family friend. No such accusation was made against Father when H.G. was in his custody during his extended parenting time.

[16] Mother points out that she has been H.G.'s primary caretaker since 2008 and that the trial court's decision "ignores the emphasis that Indiana law places upon the factors of permanence and stability in a child's life[.]" Appellant's Reply Br. p. 11. But, as Mother acknowledges, stability is not the only factor to be considered when examining the best interests of a child. The trial court must consider the overall welfare of the child by judging the whole environment. The findings of fact and conclusions show that the trial court did consider H.G.'s whole environment and her overall welfare when it modified custody.

[17] Mother also claims that the trial court's order splits custody of the children without explanation or reference to any authority. We recognize that split custody of multiple children "is the exception to the rule in Indiana," *In re Paternity of B.D.D.*, 779 N.E.2d 9, 14 (Ind. Ct. App. 2002), but there is sufficient evidence in the record to support the court's decision. Father testified that he did not seek custody of N.G. because N.G. was doing well in Florida: "He's got a lot going on. Like I said, he's about to be seventeen. He's driving. In band. Just doing really well. And I don't want to take him out of that position. . . . He's got a scholarship going. Working on a scholarship." Tr. Vol. II p. 6. Furthermore, when asked if he and H.G. had a difficult relationship, N.G. answered yes. *See id.* at 79-80. N.G. did state that he loves his sister, but he also said that she picks on him a lot and that he gets frustrated with her. *Id.* at 79. N.G. also testified that he and Father have a strained relationship and that he left Father's house during the most recent extended parenting time to go stay at Mother's brother's house for the remainder of Father's extended parenting

time.  Given this information, the trial court did not err when it modified custody of H.G., ultimately splitting custody of the children without explanation or reference to any authority.

[18]  Mother's final contention is that the findings of fact make no mention of the lack of evidence presented by Father regarding his home environment and that the only evidence supporting modification were statements by H.G. that she was left home alone.  This argument is nothing more than a request for us to reweigh the evidence, which we will not do.  *In re Paternity of Snyder*, 26 N.E.3d at 998.

[19]  Affirmed.

May, J. and Altice, J., concur.